## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**GREGORY HOUSTON,**

        **Petitioner,**

                                       **CASE NO. 2:08-CV-591; 2:08-CV-595**

   **v.**                                 **JUDGE HOLSCHUH**

                                       **MAGISTRATE JUDGE KING**

**MICHAEL SHEETS, Warden,**

        **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings these consolidated petitions for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the petitions, respondent's return of writ, petitioner's traverse, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that these consolidated actions be **DISMISSED**.

## FACTS and PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> By indictment filed October 25, 2002, defendant was charged with one count of abduction, in violation of R.C. 2905.02, a felony of the third degree, with a firearm specification pursuant to R.C. 2941.141 and 2941.145 ("Count 1"); three counts of aggravated murder, in violation of R.C. 2903.01, felonies of the first degree, with death penalty specifications pursuant to R.C. 2929.04(A)(7) and firearm specifications pursuant to R.C. 2941.141 and 2941.145 ("Counts 2-4"); one count of aggravated burglary, in violation of R.C. 2911.11, felony of the first degree, with firearm specifications pursuant

to R.C. 2941.141 and 2941.145 ("Count 5"); one count of aggravated robbery, in violation of R.C. 2911.01, a felony of the first degree, firearm specifications pursuant to R.C. 2941.141 and 2941.145 ("Count 6"); and one count of having a weapon while under disability, in violation of R.C. 2923.13, a felony of the fifth degree ("Count 7"). These charges stemmed from the alleged abduction of Michelle Bennett ("Bennett") and the robbery and murder of Mousa Al-Janadbeh ("Al-Janadbeh") ("the incident"). Defendant pled not guilty to all of the charges.

On May 14, 2004, the trial court held a hearing on defendant's motion to suppress statements he made at the time of his arrest. The trial court overruled the motion, finding that although defendant was in custody, his statements were spontaneous and not made in response to any questioning or actions of the arresting officers. Defendant did not assign this as error in the instant appeal.

Defendant's case proceeded to trial on May 18, 2004. The following relevant facts were adduced at trial. Bennett testified that on February 21, 2001,FN1 she was at the home of her friend, Missy Leady ("Leady"), when Al-Janadbeh showed up with his friend, Nasser Ismail ("Ismail") and invited the women back to his apartment to "party." (Trans. Vol. II, at 31.) Bennett and Leady agreed, and went with Al-Janadbeh and Ismail back to Al-Janadbeh's apartment.

FN1. Nasser Ismail testified to a different date, however, we find the exact date is irrelevant to the instant appeal.

While at the apartment, Bennett admitted she drank vodka and snorted cocaine. She also testified that soon after their arrival, Al-Janadbeh and Leady got into an argument. Leady was on her cell phone talking to another man, which angered Al-Janadbeh. He took her cell phone and threw it up against the wall, breaking the battery. The two began to exchange words, and in the heat of the argument, Bennett claimed Al-Janadbeh said, "how about I give you guys $30 for sex and take you home." (*Id*. at 33.) Then, according to Bennett, he went to a closet, pulled out a stack of $100 bills, and threw them on the table. This offended Bennett and Leady, and they demanded to

be taken home. Al-Janadbeh complied, and along with Ismail, drove the women back to Leady's apartment and dropped them off.

When the women arrived at Leady's apartment, defendant, Leady's sister, and a man named "Wayne" were there. Bennett testified that she began to brag about the money that Al-Janadbeh showed them, telling the group it was "the most money" she ever had ever seen. (*Id*. at 36.) She claimed that defendant began asking her a series of questions about the money, and then demanded that she take him to Al-Janadbeh's apartment. Bennett testified that defendant's demeanor made her fear for her life. (*Id.* at 38.) According to Bennett, she claimed to have initially told defendant she would not take him to Al-Janadbeh's apartment, but defendant forced her. (*Id*. at 39.)

Defendant and Wayne drove Bennett to Al-Janadbeh's apartment complex in a "long, yellow, dirty" car. *Id*. Bennett was unable to locate Al-Janadbeh's apartment in the dark, so defendant and Wayne drove Bennett back to Leady's apartment, dropped her off, and ordered her to stay there because they would be back in the morning to pick her up and go to Al-Janadbeh's apartment.

Bennett testified that defendant and Wayne showed up the next morning dressed in black clothes and wearing gloves. They drove to Northland Mall, near Al-Janadbeh's apartment, where Bennett called Al-Janadbeh and told him that she wanted to come see him and asked for his address. After he gave her his address, defendant, Wayne, and Bennett drove to Al-Janadbeh's apartment and parked in a lot near his building. Bennett got out and went up to Al-Janadbeh's door, while defendant and Wayne each took a position beside the door, standing back so they could not be seen. When Al-Janadbeh answered the door, he reached his arm out to Bennett to hug her, at which time, defendant rushed in, pushing both Bennett and Al-Janadbeh into the apartment. (*Id.* at 45.)

Once inside, Bennett testified that Wayne put a gun to her throat, and ordered her to find the money. Defendant then

proceeded to pistol-whip Al-Janadbeh, and demanded money. (*Id.* at 46 .) Al-Janadbeh stated that he deposited the money in the bank, and began to plead for his life. (*Id.* at 48.) As that was going on, Bennett heard someone coming down the stairs next to the apartment, so she told defendant and Wayne. (*Id.* at 50.) Wayne pushed Bennett out of the way and ran out the door, and Bennett immediately followed. Defendant was behind Bennett, and she claimed that when he began to exit thru the door, he fired a shot. She also testified that she heard another gunshot before she reached the car. (*Id.*) Wayne and Bennett ran to the car, reaching it before defendant, who walked. According to Bennett, when defendant got in the car, he stated that he had shot Al-Janadbeh in the leg. (*Id.* at 52.)

Bennett stated that the gun was thrown out the window near McKinley Avenue, and a bag containing some of Al-Janadbeh's possessions was thrown out of the window near Rogers Avenue. Defendant retained $80 in cash that he found next to Al-Janadbeh's computer. Thereafter, Bennett claimed that defendant and Wayne "tossed" her out of the car. (*Id.* at 56.) Bennett testified that she did not go to the police because she was scared for her life.

During trial, Bennett testified that she spoke to the police voluntarily, and disclosed that she would receive immunity for her involvement in the incident in exchange for her testimony against defendant. Bennett also admitted that she had abused substances during the evening she and Leady were at Al-Janadbeh's apartment, and further acknowledged that she had been addicted to crack cocaine for several years prior thereto. At the time of trial, Bennett divulged that she was serving a sentence for robbery at Community Based Correctional Facility on Alum Creek Drive.

Ismail, a longtime acquaintance of Al-Janadbeh, testified that he first met Bennett and Leady when he and Al-Janadbeh picked them up at Leady's apartment. While en route, he claimed that the women asked for $40 so that they could buy cocaine. Al-Janadbeh did not have any money on him, so he borrowed it from Ismail. After purchasing the cocaine, they proceeded to Al-Janadbeh's apartment. There, Bennett and

Leady snorted the cocaine they purchased, and smoked marijuana. Ismail acknowledged that Al-Janadbeh had an argument with one of the women because he was angry that she had invited someone else over to his apartment. (Trans. Vol. III, at 47.) According to Ismail, the argument ended when Al-Janadbeh told the women he wanted to take them home. Ismail told Al-Janadbeh he would ride with him, but he first wanted to change his clothes. Ismail left the room and went into Al-Janadbeh's bedroom to change. While Ismail was changing, Al-Janadbeh came in and repaid the money Ismail had lent him earlier that evening. They then drove Bennett and Leady to Leady's apartment without further incident. Ismail testified that Al-Janadbeh did not ask the women for sex that evening, although Al-Janadbeh told Ismail that he had sex with them in the past. (*Id*. at 66.) Ismail also stated that Al-Janadbeh did not show the women a stack of $100 bills. (*Id*. at 70 .) A few days later, Ismail could not get a hold of Al-Janadbeh on his phone, so he and a friend went over to Al-Janadbeh's apartment. The door was unlocked, and when Isamil went in, he saw Al-Janadbeh laying on the floor.

Nakesha Clark ("Clark") and Terrence Turnbo ("Turnbo") lived together in Al-Janadbeh's apartment complex. They both testified that they saw three people, one short white female and two black males, running from one of the buildings. Clark stated that the female and one of the males looked "kind of scared," and were the first ones to get in a yellow car parked in the parking lot. (Trans. Vol. III, at 13.) According to Turnbo, the first male that ran to the car was heavyset, and the second male, who walked to the car, was tall and slim. (*Id*. at 30-31.) Once in the car, they sped off. (*Id*. at 13.)

Columbus Police Detective Charles Distlehorst ("Officer Distlehorst") testified that he heard over the radio that Sergeant Mike Robinson was following a possible homicide suspect by the name of Gregory Houston. (Trans. Vol. II, at 172.) Officer Distlehorst, who was familiar with defendant, responded to the call. (Trans. Vol. II, at 172.) Spotting defendant in a tan car, Officer Distlehorst approached and told defendant to exit the vehicle. Defendant gave a false name, but Officer Distlehorst told defendant that he knew that his name

was Gregory Houston and informed defendant there was a warrant for his arrest. (*Id.* at 173.) Defendant attempted to escape, but was wrestled to the ground. Officer Distlehorst testified that he did not tell defendant why he was being arrested, nor did he disclose that defendant was wanted on a murder warrant. (*Id.* at 174.) Officer Distlehorst further testified that in the police cruiser, defendant made several spontaneous statements, including, "I'm not going to take the rap for this." *Id.*

Trial commenced on May 18, 2004. After presentation of the state's case, the trial court dismissed Count 7, having a weapon under disability, and dismissed Count 2, aggravated murder with specifications, after the defense rested. During deliberations on May 26, 2004, the jury sent the judge a note, asking for guidance on how to proceed given that they were at an impasse because two jurors felt defendant was not present when the offenses occurred. Over objection from defense counsel, the trial court gave the *Howard* charge. On May 27, 2003, the jury found defendant guilty of Count 5, aggravated burglary, and Count 6, aggravated robbery, including firearm specifications on each count, and not guilty of Count 1, abduction, and Counts 3 and 4, aggravated murder.

On August 4, 2004, the trial court sentenced defendant to 23 years; a ten-year prison term for each conviction, and an additional three-year prison term for the firearm specifications, with each sentence to run consecutively.

*State v. Houston*, 2005 WL 1953057 (Ohio App. 10th Dist. August 16, 2005). Petitioner filed

a timely appeal in which he asserted the following assignments of error:

Assignment of Error Number 1:

THE TRIAL COURT ERRED IN ALLOWING A WITNESS TO TESTIFY ABOUT HEARSAY STATEMENTS OFFERED BY THE PROSECUTION WHERE THE DEFENDANT HAS HAD NO PRIOR OPPORTUNITY TO CROSS-EXAMINE THE DECLARANT AND COMPOUNDS THAT ERROR WHEN IT REFUSES TO ALLOW THE DEFENSE TO UTILIZE

ADDITIONAL HEARSAY STATEMENTS WHICH OUGHT IN
FAIRNESS BE CONSIDERED CONTEMPORANEOUSLY
WITH THE PRIOR HEARSAY STATEMENTS.

Assignment of Error Number 2:

THE TRIAL COURT ERRED IN ENTERING JUDGMENT OF
CONVICTION FOR AGGRAVATED ROBBERY AND
AGGRAVATED BURGLARY BECAUSE THOSE
CONVICTIONS AGAINST THE MANIFEST WEIGHT OF
THE EVIDENCE. [SIC]

Assignment of Error Number 3:

THE TRIAL COURT ERRED WHEN IT SENTENCED
APPELLANT TO NON-MINIMUM, MAXIMUM,
CONSECUTIVE SENTENCES BASED ON FACTS NOT
FOUND BY THE JURY OR ADMITTED BY APPELLANT.

*See id.* On August 16, 2005, the appellate court affirmed the judgment of the trial court. *Id.*

Petitioner filed a timely appeal to the Ohio Supreme Court

which reversed the trial court's judgment as it pertained to
sentencing only, under the authority of [*State v. Foster,* 109
Ohio St.3d 1 (2006)]. Upon remand, the trial court resentenced
appellant to the same 23-year imprisonment term.

*State v. Houston,* 2007 WL 275596 (Ohio App. 10th Dist. February 1, 2007). Petitioner filed

a timely appeal, in which he asserted the following assignments of error:

[I.] The Court of Common Pleas violated Appellant's right to
trial by jury by sentencing Appellant to a term of incarceration
which exceeded the statutory maximum mandated by the Sixth
and Fourteenth Amendments. The decision rendered by the
Supreme Court of Ohio in *State v. Foster (*2006), 109 Ohio St.3d
1, 2006-Ohio-856 which purports to authorize sentences in
excess of the statutory maximum, is incompatible with the
controlling precedent of the United States Supreme Court and
must be rejected.

[II.] The Court of Common Pleas violated Appellant's rights under the Ex Post Facto Clause of the Federal Constitution by sentencing Appellant to a term of incarceration which exceeded the maximum penalty available under the statutory framework at the time of the offense. The decision rendered by the Supreme Court of Ohio in *State v. Foster* (2006), 109 Ohio St.3d 1, which purports to authorize the sentence rendered against Defendant is incompatible with the controlling precedent of the United States Supreme Court and must be rejected.

[III.] The Court of Common Pleas violated Appellant's rights under the Fourteenth Amendment to the Federal Constitution by sentencing Appellant pursuant to the decision rendered by the Supreme Court of Ohio in *State v. Foster* (2006), 109 Ohio St.3d 1, because the holding of *Foster* is invalid under *Rogers v. Tennessee* (2001), 532 U.S. 451.

[IV.] The Rule of Lenity requires the imposition of minimum and concurrent sentences, and the ruling of the Court of Common Pleas to the contrary must be reversed.

*See id.* On February 1, 2007, the appellate court affirmed the judgment of the trial court.

*Id.* On June 20, 2007, the Ohio Supreme Court dismissed petitioner's subsequent appeal.

*State v. Houston*, 114 Ohio St.3d 1426 (2007).

On June 20, 2008, through counsel, petitioner filed a habeas corpus petition alleging that petitioner is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

1.    The Common Pleas Court admitted hearsay as to the identification of the Defendant/petitioner from the prosecution, but then denied that same ability to admit hearsay about the same subject that would have been exculpatory, and shown the identification to be faulty. This is a violation of the Sixth Amendment right of confrontation and a denial of the right to a fair trial.

2. The Court imposed cruel and unusual punishment on the Defendant/petitioner by imposing maximum sentence in violation of all the state guidelines for sentencing. The Judge apparently considered the facts used in the Capital Murder section of the trial despite petitioner being acquitted on that charge. The Judge may not overrule the Jury's verdict, and sentence the petitioner for a crime he did not commit. His doing so also abrogated the Petitioner's right to a trial by Jury.

3. The Jury was deadlocked in the deciding of the case. The Judge then gave a "*Howard*" instruction and the Jury went back to deliberate further. The Jury obviously felt pressure to arrive at some verdict, and instead of considering the facts of the case delivered a set of inconsistent verdicts, which were not consistent with any of the evidence of the trial. This Jury only reached a "compromise" verdict to respond to the "*Howard*" charge. This denied the Petitioner of his right to a trial by Jury. From all the evidence adduced at trial it is impossible for the Petitioner to be guilty of the Robbery and Burglary charges without also being guilty of the Murder charge. A fact the Judge apparently considered in his sentencing [sic].

On the same date, petitioner filed a *pro se* petition for a writ of habeas corpus, in which he additionally asserts:

(4). I sought to gain a resentencing terms of incarceration more suitable to the offense as charge[d], minus biasness [sic] from the court following the not guilty verdicts on heavier indictment charges.

(5). All violation[s] were ever revealed since I am not legally minded.

(6). Sentenced outside guidelines.

Was sentenced to maximum sentences due to judicial biasness [sic] [be]cause the greater charges were found not guilty by the jury.

These cases have been consolidated for consideration here. C-2-08-591, Doc No. 10; C-2-08-

595, Doc. No. 11.

It is the position of the respondent that all of petitioner's claims are waived.

## PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.;Anderson v. Harless*, 459 U.S. 4, 6 (1982) (*per curiam; Picard v. Connor*, 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982);*Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id*. Second, the Court must determine

10

whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir.1985).

## A.

In claim one, petitioner asserts that he was denied a fair trial due to admission of hearsay testimony and because the trial court thereafter refused to permit petitioner to introduce evidence refuting that hearsay evidence. Petitioner properly raised this claim on direct appeal; however, the state appellate court explicitly reviewed his claim for plain error only, due to petitioner's failure to object at trial:

> In his first assignment of error, defendant advances two arguments. First, he argues that the trial court erred in allowing Detective Kathryn Justice ("Detective Justice") to testify about statements Leady made when interviewed, during which Leady identified defendant as going by the nickname of "Big Boy." According to defendant, Detective Justice's testimony was hearsay, and its admission violated his right of confrontation guaranteed by the federal and state constitutions. Second, defendant argues that after Detective Justice testified about Leady's identification of defendant as "Big Boy," the trial court erred by not allowing defendant to

introduce the police investigative videotape to show that Leady's identification of defendant as "Big Boy" did not mean that defendant was the same "Big Boy," who was with Bennett and Wayne in Al-Janadbeh's apartment. We disagree with both arguments.

The testimony at issue under this assignment of error is as follows:

Q. And after the interview of Missy Leady, did you have a name and a face to put with the words big boy?

A. Yes.

Q. Okay.

Mr. Cicero: Your Honor, I didn't hear that questions. Can that be read back?

---

Thereupon, the question was read.

---

By Mr. Mitchell:

Q. Did you?

A. Yes.

Q. And was that Greg Houston, the defendant?

A. Yes.

Q. Now, I'm just going to ask you a general question about protocol, the way that you guys handle investigations.

Do you guys present photo arrays to witnesses of suspects of which you have doubts?

A. No.

Q. Is a photo array something that is used by means of a

confirmation tool rather than an investigative tool?

A. I would say both.

Q. Would you say that a photo array is something that is used for identification purposes or for confirmation of identification?

Mr. Simmons: Objection, your Honor.

The Court: Basis?

Mr. Simmons: Can we approach?

The Court: No. Tell me your objections.

Mr. Simmons: This never never land of investigation and confirmation is mixed. It's calling for a conclusion. That is not admissible in evidence.

The Court: Mr. Mitchell.

Mr. Mitchell: I'm not sure what that-

The Court: The objection here is, is that by asking for confirmation of the investigation, the implication is that the witness has an opinion concerning the individuals.

Mr. Mitchell: Yes.

Mr. Simmons: That is what we are objecting to.

The Court: What is the relevancy of her opinion?

Mr. Mitchell: Well, the point I was trying to make is-I guess I can make it another way, if the court would ask me to do [s]o.

The Court: Ladies and Gentlemen, you have allusions, inferences, testimony about the name of Greg Houston surfacing from someone or people other than those that have testified in the courtroom, *i.e.* Michelle Bennett. Those people have not testified.

You shall not consider the fact that other people may have suggested the name of Greg Houston to have any relevancy to this case whatsoever, other than the fact to explain the actions the police may take. You may infer other people who may have given the name of Greg Houston, you may not infer from that anything concerning this defendant's guilt[ ].

Clear?

Mr. Simmons: Yes, Sir.

On redirect::

Defense counsel: And when you showed Melissa Leady this photo array isn't it true that she told you this was not the same Big Boy that you and her were discussing?

Prosecution: Objection.

The Court: Sustained. The jury will disregard-the jury will disregard anything concerning Melissa Leady in this case. She is not a witness.

As an initial matter, we note that defendant did not object to the questions posed by the state to Detective Justice regarding Leady's identification of defendant as "Big Boy." When counsel for defendant objected to subsequent questioning, the basis for the objection was that it called for Detective Justice to state a conclusion. Though defendant maintains that Detective Justice's testimony was inadmissible hearsay that violated his constitutional right of confrontation, he did not timely object to her testimony, nor did he assert a constitutional violation as the basis of his objection. See Evid.R. 103(A)(1); *State v. Murphy* (2001), 91 Ohio St.3d 516, 532, 747 N.E.2d 765. As such, defendant has waived his constitutional argument unless plain error exists. *See State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240; *State v. Allen* (1995), 73 Ohio St.3d 626, 634, 653 N.E.2d 675; Crim.R. 52(B).

Under the plain error standard, we must first find error, "a

deviation from a legal rule." *Barnes, supra*, at 27, 759 N.E.2d 1240. Moreover, the error must be "obvious" and must have impacted the defendant's "substantial rights" by affecting the outcome of the trial. *Id.,* citing *State v. Sanders* (2001), 92 Ohio St.3d 245, 257, 750 N.E.2d 90, citing *State v. Keith* (1997), 79 Ohio St.3d 514, 518, 684 N.E.2d 47. Even if a forfeited error satisfies the foregoing, Cr.R. 52(B) does not mandate that the appellate court correct it. To that end, the Supreme Court of Ohio has "acknowledged the discretionary aspect of Crim.R. 52(B) by admonishing courts to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." ' *Barnes, supra*, at 27, 759 N.E.2d 1240, quoting *Long, supra,* at 91.

Defendant does not directly deal with the issue of his untimely objections, but tacitly acknowledges the same by arguing that *United States v. Cromer* (C.A.6, 2004), 389 F.3d 662, which construed *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (statements of a confidential informant are testimonial in nature and may not be offered by the government to establish the guilt of an accused absent an opportunity for the accused to cross-examine the informant), is similar to this case, and as a result, we should reach the same result.

As relevant to the instant appeal, the Sixth Circuit in *Cromer* considered whether the trial court's admission of a police officer's testimony, which was offered for the truth of the matter, concerning information provided by a confidential informant violated the Confrontation Clause. The central issue at Cromer's trial was whether he was involved in illegal activity, and the statements of the confidential informant were the lynchpin of the government's case. And, in fact, Cromer's first trial ended in a hung jury because the government's evidence against him was so weak. The Sixth Circuit found that the statements of the confidential informant were testimonial, and because they were offered for the truth of the matter, Cromer's constitutional right of confrontation was triggered. Thus, admission of the officer's testimony was error, and in light of *Crawford,* the error was plain. The court concluded by finding that Cromer's substantial rights were

effected because "[i]n the context of a case as close as this one on the central issue of whether the defendant was involved in any illegal drug activities, the admission of these statements directly tying Cromer to the crime likely impacted the outcome of the trial." *Id.*

We find this case, however, readily distinguishable. It is true that the statements Leady made to Detective Justice during questioning can be considered testimonial. Unlike *Cromer,* however, Detective Justice's testimony regarding Leady's out-of-court statements was not offered for the truth of the matter. Rather, pursuant to the limiting instruction given by the trial court, which will be discussed *infra,* Detective Justice's testimony concerning Leady's identification of defendant as "Big Boy" was to be considered for the sole purpose of explaining police action, which is not hearsay. *State v. Banks,* Franklin App. No. 03AP-1286, 2005-Ohio-1943; *State v. Price* (1992), 80 Ohio App.3d 108, 110, 608 N.E.2d 1088, citing *State v. Blevins* (1987), 36 Ohio App.3d 147, 149, 521 N.E.2d 1105. As such, defendant's right to confrontation was not implicated. Another significant distinction between *Cromer* and the case *sub judice* is that, here, defendant's substantial rights were not affected. Even if we accepted defendant's contention that Detective Justice's testimony helped establish that the person Leady identified as "Big Boy" was the same person who took Bennett to Al-Janadbeh's apartment, thereby implicating him in the crimes, such testimony was hardly the lynchpin of the state's case, nor did it affect the outcome of the trial. Defendant admits to such under his second assignment of error, in which he argues that "[t]he only evidence that [defendant] was purportedly involved in the aggravated burglary and aggravated robbery came from the testimony of Michelle Bennett." (Appellant's Brief at 28.) [FN2] Indeed, the record discloses that the state did not rely on Leady's out-of-court identification of defendant to support his convictions, but rather, relied almost exclusively upon the testimony of Bennett, Clark, Turnbo, as well as defendant's own statements at the time he was apprehended. We find the factual differences between this case and *Cromer* preclude a finding of plain error.

FN2. To further buttress his argument, defendant quotes the

trial court's statement that "this whole case, as we all know here, really rests on the credibility of one witness." (Appellant's Brief at 28, quoting Tr. Trans. Vol. V at 29.)

As mentioned *supra*, the trial court gave the jury a limiting instruction regarding Detective Justice's testimony. It instructed the jury that while they may consider out-of-court statements made by non-testifying witnesses to explain police action, they were to disregard the same for all other purposes, and further admonished against drawing inferences regarding defendant's guilt from any such testimony. Defense counsel offered no objection to this instruction. Given that a jury is presumed to follow a trial court's instructions, *State v. Cockroft*, Franklin App. No. 04AP-748, 2005-Ohio-748, at ¶ 14, citing *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, this court must assume that the challenged statements were received and utilized by the jury only for foundation purposes.

Further, even had the trial court admitted hearsay evidence regarding Leady's out-of-court statements, such error would be harmless given that the "remaining evidence, standing alone, constitute[d] overwhelming proof of the defendant's guilt." *State v. Williams* (1983), 6 Ohio St.3d 281, 452 N.E.2d 1323, paragraph six of the syllabus. *See, also, State v. Jenkins,* Lake App. No.2003-L-173, 2005-Ohio-3092, at ¶ 37, citing Coy v. Iowa (1988), 487 U.S. 1012, 1021-1022, 108 S.Ct. 2798, 101 L.Ed.2d 857 (applying the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705, to Confrontation Clause violations).

In his second argument, defendant asserts that the trial court erred by not allowing him to introduce Leady's statements to the police, via the videotape of Leady's questioning, to show that her identification of defendant as "Big Boy" did not mean that he was the "Big Boy" with Bennett in Al-Janadbeh's apartment. He contends that the videotape was admissible under Evid.R. 803(8), and by failing to admit the same, his due process rights were violated.

The state contends, and we agree, that defendant did not raise this argument during trial, and, therefore, has waived all but

plain error. Even had defendant preserved this argument, the statements Leady made to Detective Justice in the police videotape are not admissible under Evid.R. 803(8) as a public record or report.

Evid.R. 803(8) sets forth the business records exception to the hearsay rule and provides:

Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness.

Evid.R. 803(6) and 803(8) provide hearsay exceptions for records of regularly conducted activities (business records) and for public records and reports. *State v. Watkins* (1981), 2 Ohio App.3d 402, 442 N.E.2d 478; *Randle v. Gordon* (Oct. 29, 1987), Cuyahoga App. No. 52961. In order for a police report, or in this case, the videotape of Leady's questioning, to fall within the public records exception, the report (or videotape) must set forth matters observed pursuant to a duty to report by one charged with that duty and it must be offered by the defendant. Evid.R. 803(8)*; Cincinnati Ins. Co. v. Volkswagen of America, Inc.* (1987), 41 Ohio App.3d 239, 535 N.E.2d 702. To fall within the business records exception, the report must be made at or near the time of the event by a person with knowledge, in the regular course of the agency's business. Evid.R. 803(6); *Cox v. Oliver Machinery Co.* (1987), 41 Ohio App.3d 28, 534 N.E.2d 855.

In this case, however, Leady was under "no duty to report." As such, Leady's statements represent "hearsay within hearsay which is only admissible if the second level hearsay itself falls within a specific exception." *State v. Lowry* (Aug. 31, 1989), Franklin App. No. 89AP-108. When construing the statutory predecessor to Evid.R. 803(8), the Supreme Court of Ohio stated in *Westinghouse Electric Corp. v. Dolly Madison Corp.*

(1975), 42 Ohio St.2d 122, 130, 326 N.E.2d 651:

> This statute allows the admission of official records, although these records may constitute hearsay, in so far as they consist of facts recorded by public officials who are not present as witnesses. However, the statute does not render admissible statements contained in official reports, where such statements are themselves hearsay.* * *

> "Evid.R. 805 expressly provides that hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statement conforms with an exception to the hearsay rule provided in the evidence rules." *State v. Lowry*, supra. Therefore, Leady's statements are not admissible simply because they are contained within an official report; to be admissible, her statements must also fall within a hearsay exception. *Id.* To that end, defendant does not argue, nor do we find, that Leady's statements fall within a firmly rooted hearsay exception. As such, the trial court did not err in excluding the videotape of Leady's questioning.

> Based on the foregoing, we find that defendant's right of confrontation was not violated by Detective Justice's testimony because, as per the trial court's limiting instruction, it was not hearsay. We further find that the police videotape was properly excluded, and even if it were admissible, its exclusion was not prejudicial in light of the testimony given by Bennett, Turnbo, Clark, and the statements made by defendant at the time he was apprehended. Having found no plain error, defendant's first assignment of error is overruled.

*State v. Houston, supra*, 2005 WL 1953057.

The United States Court of Appeals has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground to preclude federal habeas corpus relief. *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000); *see also Keith v. Mitchell*, 455 F.3d 662, 673-74 (6th Cir. 2006); *Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004); *Hinkle v.*

*Randle*, 271 F.3d 239, 244 (6th Cir. 2001). This Court therefore reaches that same conclusion here.

## B.

In claim two, petitioner asserts that his sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment, and that he was denied his right to trial by jury because, in imposing sentence, the trial judge improperly considered facts used in the capital murder section of the trial even though petitioner had been acquitted by the jury on that charge. Petitioner appears to raise this same issue in claims four and six. In claim three, petitioner asserts that he was denied his right to trial by jury when the trial court issued a "*Howard*" instruction. These claims are readily apparent from the face of the record and therefore should have been raised on direct appeal, but were not. Further, petitioner may now no longer present these claims to the state courts under Ohio's doctrine of *res judicata*. *See State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175 (1967). The state courts were never given the opportunity to enforce the procedural rule at issue due to the nature of petitioner's procedural default. This Court deems the first and second parts of the *Maupin* test to have been met as to claims two, three, four and six.

## C.

The Court must decide whether the procedural rules applied by the state courts to claims one through four and claim six constitute adequate and independent bases upon which to foreclose review of the petitioner's federal constitutional claims. This task

requires the Court to balance the state's interests behind each procedural rule against the federal interest in reviewing federal claims. *See Maupin v. Smith*, 785 F.2d at 138. The Court of Appeals for the Sixth Circuit has consistently held that Ohio's doctrine of *res judicata, i.e.,* the *Perry* rule, is an adequate ground for denying federal habeas relief. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir.2006); *Coleman v. Mitchell*, 268 F.3d 417, 427-29 (6th Cir.2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir.2000); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir.2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir.1998). The doctrine of *res judicata* is stated in unmistakable terms in countless Ohio decisions, and Ohio courts have consistently refused, in reliance on that doctrine, to review the merits of claims. *See State v. Cole, supra; State v. Ishmail, supra.* Further, the doctrine of *res judicata* serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. With respect to the independence prong, the Court concludes that *res judicata* does not rely on or otherwise implicate federal law. The third part of the *Maupin* test has been met.

Petitioner has waived his right to present claims one, two, three, four and six for federal habeas corpus review. He may still obtain review of these claims on the merits if he establishes cause for his procedural default, as well as actual prejudice from the alleged constitutional violations. Petitioner has failed to establish cause for his procedural defaults.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also*

*Sawyer v. Whitley*, 505 U.S. 333.  After review of the record, the Court does not deem this to be such a case.

In short, the Court concludes that petitioner has waived claims one through four and claim six.

## D.

In claim five, petitioner asserts, "[a]ll violation[s] were ever revealed since I am not legally minded."  This  Court concludes that claim five fails to assert a federal claim for relief.  Claim five is therefore without merit.

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the

*Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the

decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*,

474 U.S. 140 (1985);*United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse

decision, they may submit arguments in any objections filed, regarding whether a

certificate of appealability should issue.

February 2, 2010                                        s/Norah McCann King
                                                        Norah McCann King
                                                        United States Magistrate Judge